IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DANIELLE GRAY,<br><br>   Plaintiff,<br><br> v.<br><br>LIFE INSURANCE COMPANY OF NORTH AMERICA,<br><br>   Defendant. | Civil Action No. 2:21-cv-801 |

## COMPLAINT

Plaintiff Danielle Gray ("Plaintiff" or "Ms. Gray") brings this action against Life Insurance Company of North America ("Defendant" or "LINA") under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 *et seq*. She seeks to remedy the wrongful termination of long-term disability ("LTD") benefits under the UPMC Healthcare Benefits Trust, policy number LK-0980068 ("the Policy") issued to her former employer UPMC and underwritten and administered by LINA.

### I.  PARTIES

1. Ms. Gray is a resident of Pittsburgh, Pennsylvania, in this District.

2. Ms. Gray spent nine years working as an "HIM Technician," a.k.a. a health information technician, for UPMC until becoming disabled in August 2017.  As result of multiple serious health problems, described below, she remains disabled from all work through the present time.

3. As an employee of UPMC, she was insured under the Policy, and a "participant" within the meaning of ERISA, 29 U.S.C. § 1132(a).

4. LINA is an insurance company and underwriter responsible for paying LTD benefits under the Policy.

5. The Policy is sponsored by UPMC and is an employee benefit plan within the meaning of ERISA, 29 U.S.C. § 1002(3).

6. Pursuant to the Policy, LINA is the "named fiduciary for deciding claims for benefits under the Plan, and for deciding any appeals of denied claims."

7. LINA is a wholly owned operating subsidiary of Cigna Corporation.

8. LINA administered and decided Ms. Gray's claims for benefits under the "Cigna" banner.

## II. JURISDICTION AND VENUE

9. This Court has jurisdiction pursuant to 29 U.S.C. § 1132(e) and (f) and 28 U.S.C. § 1331.

10. Venue over this action lies in this Court pursuant to 29 U.S.C. § 1132(e)(2).

## III. FACTS

### Ms. Gray became disabled from work

11. Ms. Gray worked as an HIM Technician for UPMC for nine years until becoming disabled in 2017, when she was 36 years old.

12. Ms. Gray is a long-time asthma sufferer with a history of emergency department visits for asthma flares.

13. She also has a history of polycystic ovary syndrome (a hormonal disorder) and is morbidly obese.

14. In March of 2017, Ms. Gray underwent a CT scan which showed that she had an enlarged heart and pulmonary arterial hypertension, or narrowing or the arteries in her lungs.

15. In August of 2017, Ms. Gray went out of work as a result of respiratory problems, including chest tightness and shortness of breath.

16. In September of 2017, Ms. Gray began seeing a pulmonologist, Dr. Donahoe.

17. Dr. Donahoe observed that Ms. Gray was reporting increasing shortness of breath and chest pains.

18. Ms. Gray continued to treat with Dr. Donahoe in the fall and winter of 2017, and in January of 2018.

19. Ms. Gray underwent a pulmonary function test on January 4, 2018, the results of which were reported on February 4 and indicated that she showed a "[v]ery severe airway obstruction pattern" and was diagnosed with "acute bronchitis."

20. The report further noted that she "stated breathing is very difficult and notes chest pain over sternum."

21. A sleep study conducted on March 6, 2018 showed that Ms. Gray was suffering from "severe obstructive sleep apnea."

22. A second pulmonary function test conducted on March 16, 208 showed some improvement from her January test result, but still reported that Ms. Gray showed "severe airway obstruction pattern" and she had difficulty in actually testing her breathing capacity.

23. In March 2018, Dr. Donahoe observed that Ms. Gray "has severe sleep apnea."

24. In the meantime, Ms. Gray had applied for and received short term disability benefits for the maximum period of time such benefits were available, from August 30, 2017 to February 27, 2018.

25. As of February 28, 2018, Ms. Gray was eligible for long term disability ("LTD") benefits under the Policy to replace her lost earnings.

26. For the first 24 months such benefits were available, a participant is eligible under the Policy if she is "unable to perform the material duties" of her "Regular Occupation," i.e., "the occupation" she "routinely performs at the time the Disability begins."

27. Thereafter, a participant is eligible for LTD benefits only if she "is unable to perform the material duties of any gainful occupation for which" she "is reasonably fitted by education, training or experience."

28. Thus, pursuant to the Policy, LINA was potentially obligated to pay Ms. Gray benefits under the "regular occupation" standard for 24 months.

**LINA approves LTD benefits under the Policy's "Regular Occupation" disability standard**

29. Ms. Gray made an initial claim for LTD benefits under the "Regular Occupation" standard applicable to the first 24 months of disability on or around February 2018.

30. In its internal "investigation," concluded on May 24, 2018, LINA approved the claim and determined that "[t]he medical information on file does support the restriction of no work as evidenced by pulmonary hypertension, inpatient stay [in April of 2018], abnormal pulmonary function test more recently that is severe, edema, severe symptoms."

31. Accordingly, by letter dated May 24, 2018, LINA approved Ms. Gray's LTD claim, finding her disabled as of August 30, 2017 and awarding benefits effective February 28, 2018.

**Ms. Gray's health deteriorates; she twice rejects LINA's lump sum settlement offer**

32. On June 29, 2018 Ms. Gray underwent surgery to remove a benign mass from her appendix.

33. Following the surgery, she developed an infection of her wound and remained hospitalized until July 13, 2018.

34. On July 14, 2018, following her discharge, Ms. Gray began receiving home healthcare visits.

35. Her plan of treatment noted that she was "homebound" as a result of her recent procedure and that her goal was to "be strong enough to get back to work part time."

36. In July, August, and September of 2018 Ms. Gray received regular skilled nursing visits for wound care, as well as occupational therapy and physical therapy sessions at home in order to address "lymphedema [that is, fluid retention] in [both legs], weakness, fatigue and dizziness upon standing."

37. After receiving benefits for several months, LINA contacted Ms. Gray on December 3, 2018 and offered her a lump sum settlement payment "in full discharge of any further obligation to pay you monthly benefits under the policy in relation to this claim, past disability claims and any other claims arising out of or in any way related to this disability."

38. LINA's lump sum settlement offer represented the value of another 14.7 months of payments; essentially, the remaining benefits she would receive if she continued to be eligible for benefits under the "Regular Occupation" standard of disability described above for the full 24-month period such benefits were available.

39. Ms. Gray ultimately declined LINA's lump sum offer on December 14, 2018.

40. On April 29, 2019, Ms. Gray once began receiving home healthcare visits as a result of functional limitations in "endurance," "ambulation," and shortness of breath "with minimal exertion".

41. Her plan of care noted that "there is a normal inability to leave the home requiring a considerable and taxing effort due to . . . shortness of breath with minimal exertion; requires frequent rest periods; requires the use of oxygen; use of assistive equipment; decreased muscle

strength." The plan also indicated she was a "fall risk" due to "unsteady gait/poor balance."

42. From May through November of 2019, she continued to undergo at home physical therapy sessions and occupational therapy to address her respiratory problems as well as severe leg pain resulting from lymphedema.

43. Ms. Gray also received skilled nursing visits at her home from July through November, 2019.

44. In the meantime, on September 20, 2019, a LINA representative reached out to Ms. Gray by phone to discuss its lump sum settlement offer "since," according to the representative's notes of the call, "[Ms. Gray] is approaching the [Any Gainful Occupation] date in 5 mos wanted to revisit this with her."

45. The representative noted that she reminded Ms. Gray that if she took the settlement offer, "it is only through remaining mos due to her under [Regular Occupation standard] based on current med and we'd waive any retro SSDI benefits if awarded."

46. Ms. Gray declined the settlement offer for a second time.

**LINA terminates benefits under the "Any Gainful Occupation" standard based on the evaluation of paid physicians**

47. On October 4, 2019, LINA wrote to Ms. Gray, informing her that her claim was approaching the point where the definition of disability changes from the "regular occupation" definition to the "any gainful occupation" definition.

48. Upon LINA's request, Ms. Gray underwent an "independent medical evaluation," or "IME," on February 18, 2020, which was arranged by a company called MES Solutions ("MES").

49. The IME was conducted by a local doctor, Dr. Constantino.

50. Dr. Constantino was compensated by MES to conduct the examination.

51. LINA in turn paid MES for the IME report.

52. In his IME report, Dr. Constantino observed that Ms. Gray "has morbid obesity as the underlying problem contributing to weakness, difficulty walking without assists, sleep apnea, diabetes, hypertension, and legedema, which decompensated following a resection of benign right peritoneal cystic endosalpingosis mass on 6/29/18 that was complicated by wound infection, abdominal pain with diarrhea, and deconditioning."

53. Dr. Constantino claimed that Ms. Gray "has a very positive review of systems for multiple complaints suggestive of disability seeking illness behavior and/or anxiety and depression."

54. He also observed on exam "[u]pper airway persistent noisy breathing" but concluded that Ms. Gray's "upper airway noisy breathing may have been intentional to portray more severe asthma that has not been proven objectively."

55. Dr. Constantino thus opined that "[t]he medical records and examination findings do not objectively substantiate physical impairments to support a total lack of work capacity. She is physically capable of sedentary to light DOT exertional full-time work."

56. By letter dated March 5, 2020, LINA informed Ms. Gray that her LTD benefits would be terminated effective February 28, 2020.

57. LINA's March 5, 2020 denial letter noted that based upon the findings of Dr. Constantino's IME, it was concluded that Ms. Gray was not "disabled" because she could perform a "sedentary" occupation, including that of a "Hospital-Admitting Clerk -2 205-362-018" and a "Diet Clerk – 245.587-010."

**LINA upholds its decision to terminate benefits based on the medical record review of a second paid "independent" physician**

58. On April 28, 2020, Ms. Gray appealed the termination of benefits by email,

writing as follows:

> … I am writing you this letter in hopes of reopening my case for long term disability. I am currently dealing with a lot of health issues and currently can't return to my position. I have acute chronic asthma and pulmonary hypertension. Even though the doctor who evaluated me said my asthma was upper airways its still severe. I recently was hospitalized for this incident. I also have chronic abdominal pain from my previous surgery and go to pain clinic to get treated for this illness. I currently get upmc home health care. My nurse comes twice a week and so does my physical therapy. I still have mobility issues and dealing with my lymphodema issues as well. My nurse also helps with my uncontrolled diabetes issues and monitoring my hypertension. I also have a surgery coming up May 4th to evaluate my acute chronic stomach issues. You can follow up with my health issues with my doctors. My mobility issues and pain issues are so severe its hard to walk and sit for periods of time. I need help with my basic day to day activities such as cooking, laundry, even dressing are a challenge for me. I contacted the department of aging for help needed around the house and day to day living need because I can not do them on my own. I am asking that you please reconsider and I am asking for an appeal in my disability case. I am very sick at this time but my doctors are working with me to get better so I can eventually return to work.

59. LINA referred Ms. Gray's appeal to its "Disability Appeals Team."

60. On appeal, another doctor hired by MES, Dr. Rea, reviewed Ms. Gray's medical record information.

61. Dr. Rea's report, provided by MES to LINA on or around July 22, 2020, concluded that Ms. Gray was "physically functionally limited from March 5, 2020 continuing."

62. Dr. Rea pointed out that Ms. Gray's case "involves Chronic Obstructive Pulmonary Disease (COPD) in the form of asthmas, complicated by pulmonary hypertension and obesity. Over time, the claimant's PFTs [pulmonary function tests] lingered in the mid-50s, or low moderate range bordering on severe, which would begin at 49%. Medical evidence in the documentation suggests a very high level of deconditioning and debility, also seen in extensive rehabilitation efforts after elective surgery, which had realized some complications, as well as minimal efforts causing a sharp shift in physiologic response during exam."

8

63. Despite this conclusion, Dr. Rea opined "it would be reasonable to recommend that the claimant is capable of performing work on a full-time basis of 8 hours per day and 5 days per week or 40 hours each week" subject to limitations on certain activities, including that her ability to sit was "unrestricted," that she could stand for "a total of 15 minutes at a time, for a total of up to 2 hours per 8-hour day," and that she could walk for "a total of 15 minutes at a time, for a total of up to 1 hour per 8-hour day."

64. Following his initial report, Dr. Rea completed a series of "addendum review requests" in response to additional medical information relevant to Ms. Gray's claim.

65. In an addendum dated August 24, 2020, Dr. Rea recounted a phone call with the nurse working with Dr. Donahoe, who informed him that Ms. Gray was then using "supplemental Oxygen at night" as a result of a sleep study which showed "significant nocturnal Oxygen saturation."

66. The call with Natalie, Dr. Donahoe's nurse, did not change Dr. Rea's assessment with respect to Ms. Gray's limitations.

67. In an addendum dated August 27, 2020, Dr. Rea noted that cardiologist Dr. Power had treated Ms. Gray on August 18, 2020; he summarized Dr. Power's notes in which the latter observed that "[o]ver the past few months [Ms. Gray] has been having sharp chest pains. . . . At times she also complains of heart racing. She has a great deal of difficulty with obesity and dyspnea on exertion."

68. Dr. Power also noted that Ms. Gray has "[c]ardiomegaly [enlarged heart] on chest x-ray which is new."

69. The material from Dr. Power did not change Dr. Rea's assessment; he wrote "[t]he additional information was from a cardiac standpoint and added to the overall pulmonary-

related issues, as there was another component added to influence shortness of breath, which was the driving fact in impairment and consequent limitation. Therefore, my prior determination remains unchanged."

70. In an addendum dated September 14, 2020, Dr. Rea noted that obstetrician and gynecologist Dr. Miller had submitted a letter dated August 20, 2020 on behalf of Ms. Gray in which he noted that she "has multiple medical problems: pulmonary hypertension, right hip dysplasia, morbid obesity (greater than 390 lbs), low back pain, pulmonary vascular congestion, chronic SOB, sleep apnea, lymphedema, asthma, chronic abdominal pain, type 2 diabetes, cervical dysplasia, hypertension, need for nocturnal oxygen (nocturnal hypoxia), and a history of pelvic endosalpingiosis. She sees multiple physicians and cannot continue to work as a medical record coordinator at Children's Hospital. She has multiple agencies that she her in the house."

71. The letter from Dr. Miller did not change Dr. Rea's assessment; he wrote "COPD is at a high level and has many compromising factors working against it. There is morbid obesity. There is OSA, which serves as a separate antagonizing feature, and because of suboptimal treatment due to treatment noncompliance, pulmonary hypertension is further exacerbated by untreated OSA. Based on my review of the additional information, my prior opinion remains unchanged, as the medical records, along with a couple of previous conversations, attested to the impact of COPD and its co-morbidities, signifying impairment with consequent limitation."

72. On August 18, 2020 a LINA representative directed MES to have Dr. Rea reach out to Dr. Donahoe regarding Ms. Gray's condition, noting that he had previously tried to reach him at the wrong phone number.

73. In an addendum dated September 25, 2020, Dr. Rea recounted a phone conversation with Dr. Donahoe:

> Dr. Donahoe explained that the claimant has very limited function giving, as an example that she could barely walk back and forth in the office without becoming symptomatic. There had been chest pain and shortness of breath owing to Chronic Obstructive Pulmonary Disease (COPD). Dr. Donahoe added that this was not a "terminal" situation, but there was marked dysfunction due to symptoms. Dr. Donahoe pointed out that symptoms were further exacerbated by obesity and sleep apnea. Dr. Donahoe and the group at Comprehensive Lung Center plan to monitor the claimant's situation and address symptoms with no strong expectation that there will be significant clinical improvement.

74. The call did not change Dr. Rea's assessment; he wrote "My discussion with Dr. Donahoe, in particular, helped to further verify the presence of advanced COPD which, when coupled with pulmonary hypertension and obesity, create a degree of physical impairment and consequent limitation, as expressed in the initial review and its addenda."

75. Ultimately, LINA denied Ms. Gray's appeal by letter dated October 26, 2020, adopting the restrictions and limitations identified by Dr. Rea and again claiming that Ms. Gray was not disabled because she would be able to work as a "Hospital Admitting Clerk" or "Diet Clerk."

76. LINA's October 26 letter also noted "[w]e are aware that you were recently referred to pulmonary rehab; however, these records and exams would be considered more recent medical information and would not address the time frame under investigation."

77. Since the time of LINA's denial, Ms. Gray now uses supplemental oxygen at night *and* through most of the day.

78. Ms. Gray's administrative remedies with respect to her LTD claim have been exhausted.

### IV.  CLAIM FOR DENIAL OF BENEFITS UNDER ERISA § 502(a)(1)(B)

79. The foregoing paragraphs are incorporated herein by reference as if set forth at length.

80. Pursuant to ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), Ms. Gray may bring an action to recover benefits due to her under the terms of the Policy, to enforce her rights under the terms of the Policy, or to clarify her rights to future benefits under the terms of the Policy.

81. ERISA § 404, 29 U.S.C. § 1104 requires that fiduciaries of employee benefit plans "solely in the interest of the participants and beneficiaries" of the plan.

82. ERISA § 503, 29 U.S.C. § 1133 also requires that every employee benefit plan must: "afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim."

83. In its handling of Ms. Gray's LTD claim, LINA did not act in her interest.

84. Instead, as evidenced by its repeated attempts to get her to release her rights with respect to her LTD claim in exchange for a lump sum settlement offer, LINA cast itself in an adversarial position to Ms. Gray.

85. The lump sum offer is evidence of LINA's conflict of interest, in that it sought to minimize its financial responsibility for Ms. Gray's claim despite knowing that the severity of her disability rendered her unable to perform the material duties of any occupation.

86. The offer demonstrates that LINA's interest in controlling the costs of paying future benefits to her overrode any interest it had in ensuring that Ms. Gray's claim was properly administered under the Policy and impacted its decision-making.

87. After Ms. Gray rejected LINA's settlement offer, it thereafter undertook a review which was designed to find that she was capable of "any gainful occupation" and therefore that LINA did not owe her LTD benefits beyond the 24 months "regular occupation" period.

88. LINA's adopted the conclusions of two doctors who were paid by MES, a company that relies upon business from LINA, and thus has an interest in supplying reviews which result in finding that LINA does *not* have to pay benefits.

89. Moreover, neither Dr. Constantino nor Dr. Rea provided reasoned or meaningful assessments of what Ms. Gray could or could not do in light of her various medical conditions.

90. For example, Dr. Rea's acceptance of Dr. Donahoe's statement that Ms. Gray "could barely walk back and forth in the office without becoming symptomatic," which he pointed out "helped to further verify the presence of advanced COPD," along with his assessment that Ms. Gray has "very high level of deconditioning and debility" simply does not square with his conclusion that she was capable of even sedentary work for a full eight hour day.

91. As another example, neither questioned how a claimant whose health in in such a state that she requires regular at home healthcare could realistically maintain a full-time job.

92. LINA compounded this problem by funneling only the assessments of its paid doctors to a paid "Rehabilitation Specialist," who identified supposedly available occupations to Ms. Gray based on solely on a list of the functional limitations (e.g. "sitting is unrestricted," etc.) without a meaningful analysis of whether Ms. Gray was capable of performing the job given her medical conditions.

93. For example, the Dictionary of Occupation Titles definition for "Hospital Admitting Clerk" indicates that consistent talking is a requirement of the position. See https://occupationalinfo.org/20/205362018.html ("Interviews incoming patient or representative

and enters information required for admission into computer: Interviews patient or representative to obtain and record name, address, age, religion, persons to notify in case of emergency, attending physician, and individual or insurance company responsible for payment of bill. Explains hospital regulations, such as visiting hours, payment of accounts, and schedule of charges.").

94. Nevertheless, LINA's assessment did not take into account whether this would be possible for someone with what Dr. Rea conceded was suffering from "COPD . . . at a high level." See https://copd.net/symptoms/severe-symptoms (noting that severe symptoms of COPD can cause "difficulty talking").

95. LINA's method of review was designed to first identify Ms. Gray's purported functional capacity—e.g., her ability to sit, stand, etc.—based on a narrow view of her conditions/symptoms in isolation, without meaningful consideration of the impact of those conditions/symptoms on her ability to work.

96. Based solely on that functional capacity evaluation, LINA then identified so-called sedentary occupations that ostensibly fit the "any gainful occupation" definition in the Policy, again without conducting a meaningful analysis of whether Ms. Gray was capable of performing those jobs given her restrictions.

97. By virtue of the above acts, LINA violated ERISA § 404, 29 U.S.C. § 1104, and § 503, 29 U.S.C. § 1133, by breaching its fiduciary duty to her and failing to provide her a "full and fair review."

98. Notwithstanding that Ms. Gray conclusively demonstrated that she is "Disabled" under the Policy at all relevant times, LINA wrongfully terminated her benefits.

## V.  RELIEF REQUESTED

WHEREFORE, Plaintiff prays that this Court:

(a) Grant judgment in her favor and against Defendant on all claims;

(b) Order that Defendant pay all benefits due under the Policy from February 28, 2020 to the date of judgment, including interest thereon;

(c) Declare Plaintiff's rights under the terms of the Policy, and clarify her rights to future benefits under the terms of the Policy;

(d) Order that Defendant pay the costs of suit, including Plaintiff's attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g); and

(e) Award all such other and further relief as this Court deems just and proper.

Dated:  June 17, 2021                    Respectfully submitted,

 s/ Tybe A. Brett
Tybe A. Brett, Esq., PA I.D. 30064
tbrett@fdpklaw.com
Ruairi McDonnell, Esq., PA I.D. 316998
rmcdonnell@fdpklaw.com
**FEINSTEIN DOYLE PAYNE**
  **& KRAVEC, LLC**
Law & Finance Building, Suite 1300
429 Fourth Avenue
Pittsburgh, PA  15219
T.: (412) 281-8400
F.: (412) 281-1007

*Attorneys for Plaintiff Danielle Gray*